**R.L. WINSTON ROD COMPANY,**
**a California corporation,**
**Plaintiff,**

v.

**SAGE MANUFACTURING COMPANY, a Washington corporation, and Orvis Services, Inc., a Vermont corporation, Defendants.**

**No. CV 93–51–H–CCL.**

United States District Court,
D. Montana,
Helena Division.

Nov. 16, 1993.

William L. Madden, Jr., Goetz, Madden & Dunn, P.C., Bozeman, MT, Richard B. Ferrari, Ferrari Law Office, Coronado, CA, for plaintiff.

Michael B. Anderson, Holland & Hart, Billings, MT, Ramsay S. Al–Salam, Richard J. Wallis, Bogle & Gates, Seattle, WA, for defendant Sage.

Mike Greely, Greely Law Office, Helena, MT, Thomas E. Young, Robert V. Vickers, Body, Vickers & Daniels, Cleveland, OH, for defendant Orvis.

### OPINION AND ORDER

LOVELL, District Judge.

I fish because I love to; because I love the environs where trout are found, which are invariably beautiful, and hate the environs where crowds of people are found, which are invariably ugly; because of all the television commercials, cocktail parties, and assorted social posturing I thus escape; because in a world where most men seem to spend their lives doing things they hate, my fishing is at once an endless source of delight and an act of small rebellion; because trout do not lie or cheat and cannot be bought or bribed or impressed by power, but respond only to quietude and humility and endless patience; because I suspect that men are going along this way for the last time, and I for one don't want to waste the trip; because mercifully there are no telephones on trout waters; because only in the woods can I find solitude without loneliness; because bourbon out of an old tin cup always tastes better out there; because maybe one day I will catch a mermaid; and, finally, not because I regard fishing as being so terribly important but because I suspect that so many of the other concerns of men are equally unimportant—and not nearly so much fun.

Robert Traver, *Anatomy of a Fisherman* [1]

This case is about tools for fishing—"high-end" green graphite fly-fishing rods manufactured and sold by the parties.

Not far from where this opinion is written lie the headwaters of the Missouri River. Nearby, close to the confluences of the Ruby, the Beaverhead, and the Big Hole rivers is the town of Twin Bridges, Montana, home of the R.L. Winston Rod Company ("Winston").

Winston began as a fishing rod manufacturing company in 1929 in California, but moved its operation to Montana in 1977. It makes and sells expensive fishing rods. Defendants Sage Manufacturing Company ("Sage") and Orvis Services, Inc., ("Orvis") likewise manufacture and sell expensive fishing rods in competition with Winston and with each other.

Traditionally, fly rods were made of bamboo. Winston began making bamboo rods in 1929 and makes them today. Incorporating technological improvements, Winston, like other rod makers, began using fiberglass in the 1940's. In the 1970's, space age technology brought the advent of graphite. Plaintiff began selling its graphite rods in the late 1970's and claims a common law trademark in the color green based on use since 1977.

Winston here seeks a preliminary injunction enjoining Sage and Orvis from selling their graphite rods in any shade of the color green. It claims it was the first to use the color, has featured green in its advertising and promotion, and that Winstons have become known as "the green rod." Winston alleges that Defendants introduced green rods into the market in 1992 and thereby violated various state trade practice acts by diluting the trademark.[2] Defendants have moved to dismiss on the ground *inter alia* that a color is not entitled to trademark protection. This court has diversity jurisdiction under 28 U.S.C. § 1332.

Although Winston's suit might seem facially directed at all green fly-fishing rods, this is not the true thrust of its case. Winston's witness, Mr. Morgan, testified that its claim was not directed at any but "high-end green graphite rods." Upon inquiry, he confirmed this excludes all bamboo rods. Upon further inquiry, Mr. Morgan testified that graphite fly rods, selling at retail prices below $350, are not included in Winston's claim. This means that green graphite fishing rods sold by L.L. Bean and Cabela's at prices below that amount do not fall within the protected class. It also means that green graphite

---

1. Traver may be better known among lawyers who do not fish as the author of *Anatomy of a Murder*. When not writing or fishing, he served on the Supreme Court of Michigan under his real name, John D. Voelker.

2. Specifically, Mont.Code Ann. § 30–13–335(1) (1991); Ida.Code § 48–512 (1977 Repl.Vol.); Or. Rev.Stat. § 647.107; Rev.Code Wash. § 19.77.-160 (1993 Supp.); Cal.Bus. & Prof.Code § 14330; Rev.Stat.Neb. § 87–122 (1987 Repl. Vol.); Fla.Stat.Ann. § 495.151 (1988); N.Y.Gen. Bus.Law § 368–d.

fishing rods produced by Powell, and by Fisher, although recognized by Mr. Green, president of Sage, and also by Orvis as especially fine rods, are not "high-end" as defined by Winston. This apparently narrows the field to two manufacturers other than Winston who also presently offer green graphite fly-fishing rods, i.e., Sage and Orvis.

It was Mr. Green's testimony that if money were no object, one could not produce a finer rod than Sage's flagship model which retails at about $500. Orvis' offerings as depicted in its evidence similarly indicate an upper price level approximating $500. Thus, it seems that this case is directed only at green graphite fly-fishing rods selling at retail prices ranging from $350 to about $500, made and sold by Sage or Orvis.

The motion for preliminary injunction and the motions to dismiss have been ably briefed by counsel, and the court conducted a hearing on the preliminary injunction motion November 5, 1993, at which all parties had an opportunity to present evidence. Plaintiff appeared at the hearing by Richard B. Ferrari of Coronado, California, and William L. Madden, Jr., of Goetz, Madden & Dunn, P.C., Bozeman, Montana. Sage appeared by Ramsay M. Al-Salam and Richard J. Wallis of Bogle & Gates, Seattle, Washington, and Michael Anderson of Holland & Hart, Billings, Montana. Orvis appeared by Thomas E. Young of Body, Vickers & Daniels, Cleveland, Ohio, and Mike Greely of Helena, Montana.

After hearing the testimony, reviewing the exhibits, including handling the fine rods, and considering the arguments put forth by the parties both at the hearing and in their briefs, the court is prepared to rule.

## I. APPLICABLE LAW

■ A party seeking a preliminary injunction must show either: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822 (9th Cir.1993). These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *Oakland Tribune Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985).

■ In *Jensen,* the plaintiff claimed protection of the color blue in hi-fi speaker surrounds. The *Jensen* court stated that the plaintiff must show that the claimed trademark "(1) is nonfunctional; (2) is either inherently distinctive or has acquired a secondary meaning; and (3) is likely to be confused with [defendant's] products by members of the consuming public." 4 F.3d at 825. Winston brought its claim under the anti-dilution statutes of eight states. The Montana statute is typical, providing that "likelihood of injury to business reputation or of dilution of the distinctive quality of a mark . . . . is grounds for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." Mont.Code Ann. § 30–13–334 (1993). Under these statutes, an injunction may be granted where the first user can show that the mark is distinctive and the subsequent user's application of that mark dilutes its distinctiveness without a showing of confusion. To prevail on the merits therefore, Plaintiff must prove that it is entitled to trademark protection in the color green as used in graphite fly rods.

## II. MAY ONE OBTAIN A TRADEMARK IN A COLOR?

■ State unfair competition laws are designed to promote ethical business practices. If a business finds a successful method of marketing its products, other businesses may not unfairly capitalize on that method. Of course, not all marketing methods are protected. To secure exclusive use of a trademark, the claimant must establish that the mark is distinctive or that it has acquired a "secondary meaning," that is that consumers associate the mark with the goods. Trademark registration serves these functions; in the absence of registration, the claimant must prove them. Burgunder, *Trademark Registration of Product Colors: Issues and*

*Answers,* 26 Santa Clara L.Rev. 581, 586–88 (1986).

■ Sage and Orvis claim that even if Winston establishes its claim to the color green, the claim must fail as a matter of law because colors are not entitled to trademark protection. Historically, color alone has not been protected by trademark. The trend, however, is toward protection. In the landmark case of *In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116 (Fed.Cir.1985), the court permitted registration of the color pink as a trademark for the manufacturer's residential insulation. It is clear, however, that color is not always entitled to protection as a mark. The facts and circumstances of each case must be examined:

> As for all marks, compliance with the legal requirements for registration depends on the particular mark and its circumstances of use. In determining registrability of color marks, courts have considered factors such as the nature of the goods, how the color is used, the number of colors or color combinations available, the number of competitors, and customary marketing practices.
>
> *Id.* at 1120.

Earlier decisions evidence a concern that permitting a trademark in a color would restrict competition because there are only a limited number of colors in the palette. The court in *Owens–Corning* dealt a blow to this "color depletion theory," finding that even if Owens–Corning were given exclusive use of the color pink on fiberglass insulation, all other shades of color would still be available to other manufacturers. Therefore, competition would not be hindered by reserving exclusive use of the color pink to one manufacturer. *Id.* at 1121.

In contrast to the many shades of color available for fiberglass insulation, the evidence shows that the color palette available for the manufacture of fly rods is extremely limited. One limiting factor is the method by which the color is applied to the rod. The rod is made in part of graphite, which is a carbon and so is naturally black, and the color is applied as a dye, not a paint. Only a few dark shades successfully mask the black base and colors applied to it darken deeply.

Under these circumstances, granting exclusive use of a color to one manufacturer would severely restrict competition; there would be little left for the rest of the world.

A second reason for denying trademark protection to a color arises when the color serves a functional purpose. Color may serve several functional purposes. One is utilitarian functionality, where the color has a meaningful significance. For example, in *Sylvania Electric Products, Inc. v. Dura Electric Lamp Co.,* 247 F.2d 730 (3d Cir. 1957), the court held that the Sylvania "Blue Dot" on a flashbulb could not be the subject of trademark registration because it served the utilitarian function of indicating air leakage. Another functional purpose is aesthetic functionality, where the color gives a manufacturer an advantage because the consumer deems the particular color to be more attractive for that type of item:

> If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made.

Defendants have not shown that the color green in a fly rod serves any utilitarian function. The color comes closer to serving an aesthetic function. The evidence indicates that consumers of high-end fly rods prefer rods in a limited range of colors, principally those that evoke the natural colors of the outdoor environment in which they are used, e.g., green, black, and brown. It is not so important to categorize the function of the color, however, as it is to determine whether manufacturers have a competitive reason for using a limited number of colors. If competitive factors restrict the available colors, then color may be functional.

In *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1382 (9th Cir.1987), the court affirmed the district court's refusal to grant a preliminary injunction prohibiting manufacturers from selling antifreeze in yellow jugs on grounds that the district court had found a "competitive need for the color yellow." Recently, in *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823–24 (9th Cir.1993), the court in dicta questioned whether the color depletion theory is still persuasive, citing *Master Distributors, Inc. v. Pako Corp.*, 986 F.2d 219 (1993), in which the Eighth Circuit stated that a manufacturer might secure trademark protection for a particular shade of color.

In this case, Defendants have proven that the range of available colors is limited. In *Owens–Corning*, the court found that because there was no limitation on the colors available for fiberglass insulation, the color pink was entirely arbitrary and served no functional purpose. Furthermore, the color of insulation is concealed when the product is used. With graphite fly rods, on the other hand, the palette is limited by the dyeing process and by consumer preference. Moreover, unlike the manufacturer in *Master Distributors*, Winston is seeking exclusive use of *all* shades of green. Under these circumstances, recognition of a trademark in color would considerably reduce competition in an unacceptable manner. Therefore, while one may obtain a trademark in a color, the facts must be carefully weighed to determine whether Winston has proven its entitlement to the mark.

## III. HAS WINSTON CREATED A DISTINCTIVE MARK IN THE COLOR GREEN?

The *Jensen* court stated:

> A mark or dress is distinctive when it identifies the particular source of the product or distinguishes it from other products.... Correspondingly, a product's trademark or trade dress acquires a secondary meaning when the purchasing public associates the mark or dress with a single producer or source rather than with the product itself.

*Jensen*, 4 F.3d at 824 (citations omitted).

The green in a fly rod is not inherently distinctive, like the words *Kodak* or *Xerox*. It does not by itself indicate the source of the product. Winston must therefore show that its mark has acquired a secondary meaning, the public association of Winston with that particular color. Winston argues that it is known as "the green fly rod." However, the evidence at best shows that this means that all Winston graphite fly rods are green, not that the public perceives that all green fly rods are made by Winston. The evidence adduced casts substantial doubt on Winston's allegation that it was the sole manufacturer of green graphite fly rods between 1977 and 1992. In fact, the weight of the evidence is to the contrary.

Furthermore, Winston has not promoted this alleged distinctive quality. Winston introduced considerable evidence, including fishing catalogs, in which third parties have alluded to the green color of Winston rods. Lacking however, is substantial evidence that Winston itself promoted this color as a distinctive feature. Other than the instant lawsuit, Winston has not taken any overt action to protect its rights or to enforce its claim. This lack of action is contrasted with Owens–Corning's substantial efforts to advertise its pink insulation so as to reinforce the secondary meaning in the eyes of the public. *In re Owens–Corning Fiberglass Corp.*, 774 F.2d 1116, 1125–27 (Fed.Cir.1985).

To establish secondary meaning, Winston offered the results of a "survey." However, the survey solicited the views of sellers of the product, not the consuming public. In *Plastilite Corp. v. Kassnar Imports*, 508 F.2d 824 (C.C.P.A.1975), the court stated:

> Appellant emphasizes that its intent in adopting the yellow-orange color scheme was for this to function as a trademark and criticize the board for stating that appellant had not promoted its floats to the general public. However, it is the association of the mark with a particular source by the ultimate consumers which is to be measured—not appellant's intent.

*Id.* at 827 (citation omitted).

The survey is questionable at best on other grounds. Yet, even if taken at face value, it

does not establish that Winston has created a secondary meaning. The respondents identified a number of manufacturers of high-end green fishing rods, including some not parties to this lawsuit. Winston apparently interprets this result as evidence of successful dilution by Defendants. But Winston cannot have it both ways. If all the responses to the survey had mentioned Winston, it would argue that it had established secondary meaning; if no response had mentioned Winston, it would argue that it had established dilution. For all these reasons, I can give Plaintiff's survey little weight, even if Defendants' motions to strike were not granted, as they apparently should be.

Neither through the survey nor through other evidence has Winston proven that its use of the color green has created a distinctive mark.

## IV. CONCLUSION AND ORDER

### A. Preliminary Injunction

While this court has determined that there are circumstances in which a color is entitled to trademark protection, it has determined that Plaintiff will probably not prevail in showing that its color is a trademark and that such circumstances are present in this case. In fact, it is likely that Defendants will prevail. Because the court has resolved the matter by determining that Plaintiff will probably not prevail on the merits, the other elements requisite for temporary injunction need not be addressed. Plaintiff's request for preliminary injunction must be denied.

### B. Motions to Dismiss

■ For purposes of a motion to dismiss, the allegations in Plaintiff's complaint must be deemed to be true. Plaintiff alleges that it has a valid mark in the color green as used in its graphite rods and that Defendants have diluted that mark. Defendants' motions to dismiss argue as a matter of law that a color cannot be a trademark. I reject that argument; there are circumstances in which a color may be entitled to trademark protection. Therefore, Defendants' motions must be denied.

For the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's request for preliminary injunction is DENIED; and

IT IS FURTHER ORDERED that Defendants' motions to dismiss are DENIED.