THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                    Mailed:
14 September 2006                            31 August 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Saint-Gobain Corporation
v.
3M Company[1]

_____

Opposition No. 91119166
to application Serial No. 75488524

_____

Roberta Jacobs-Meadway of Ballard Spahr Andrews & Ingersoll,
LLP for Saint-Gobain Corporation.

Roberta L. Horton of Arnold & Porter LLP for 3M Company.

_____

Before Hairston, Grendel, and Drost, Administrative
Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On May 18, 1998, 3M Company (applicant or 3M) filed an

application to register a mark described as follows on the

Principal Register:

> The mark consists of a distinctive purple color as
> applied to the entirety of [the] rough side of the
> goods.  The mark is lined for the color purple and
> color is claimed as the mark.  The dotted lines merely
> indicate the position of the mark on the goods and do
> not form part of the mark.

---

[1] Applicant was originally identified as Minnesota Mining and
Manufacturing Company a/k/a 3M Company.  As a result of an
assignment document recorded April 30, 2002, applicant's name was
changed to 3M Company.  Reel and Frame No. 2502/0547.

The goods were identified as "sandpaper" in Class 3 and the mark in the drawing appeared as follows:



The application (Serial No. 75488524) contained dates of first use anywhere and in commerce of 1989. In addition to claiming that the mark was inherently distinctive, the application also contained an alternative claim that the mark had acquired distinctiveness under Section 2(f) of the Trademark Act. 15 U.S.C. § 1052(f).

The application was published for opposition on January 4, 2000, with a claim of distinctiveness under Section 2(f) and with this additional sentence added to the description of the mark: "The stippling in the mark shows the texture of the goods and does not represent color."

On May 1, 2000, Saint-Gobain Corporation (opposer or SG) filed a notice of opposition. In the notice of opposition, opposer alleged that its subsidiaries used the color purple on abrasives prior to applicant, that the color of the product functions as an indicator of abrasive grit size, and that applicant's mark has not acquired distinctiveness. Applicant has denied the salient allegations of the Notice of Opposition. After extensive

discovery and trial periods, an oral hearing was held on September 14, 2006.

## The Record

The parties agree that the record as set out by opposer in its brief on pages 4 and 5 is accurate. Applicant adds that opposer did not mention its motion for summary judgment that was denied, and judgment sua sponte was entered for applicant on the issue of whether applicant was seeking to register multiple marks. We add that the parties submitted more than sixty depositions from more than thirty-five different witnesses.

## Amendments

On December 18, 2000, applicant moved to amend the description of the mark to the following:

> The mark consists of a distinctive purple color as applied to the entirety of [the] rough side of the goods, specifically, a shade of purple represented by a hue angle of approximately 285° as measured by the X-Rite SP62 portable spherical spectrometer with an observer angle of 10° and with an illuminant equal to F2 which represents cool fluorescent lighting. The mark is lined for the color purple and color is claimed as the mark. The dotted lines merely indicate the position of the mark on the goods and do not form part of the mark.

Opposer's color expert witness testified that:

> In order to investigate whether the 3M definition captures Saint-Gobain's current products, it is necessary to choose a tolerance for indicating the limits within which a color is "approximately" at a hue angle of 285. As discussed in Section 2.1 above, the most scientifically accepted method for specifying color tolerances is in terms of $\Delta E*$, but for hue angle

> alone, this is not possible. So, for these purposes ±5% of possible hue angles was chosen as tolerance.
>
> 18° + 5% x 360°
>
> This interpretation of the 3M definition finds any hue angle that is 285° ±18° to be approximately 285°. Using this conservative reading of the 3M definition, 8 of the Saint-Gobain products, nearly 30% of those tested, were found to fall within it.

Rosen dep. Ex. 81, p. 8.

On April 30, 2001, applicant filed another motion to amend the application. This time applicant sought to amend the identification of goods from "sandpaper" to "sandpaper, namely, coated abrasives with either paper or cloth backing."

On November 6, 2003, the board, in a decision on opposer's motion for summary judgment, granted applicant's motion to amend the description of the mark as conceded but deferred a decision on applicant's motion to amend the identification of goods until final decision.

On March 3, 2005, applicant filed a third motion to amend its application/second motion to amend the description of the mark. The new amendment sought to amend the description of the mark to add the language set out in italics below:

> The mark consists of a distinctive purple color as applied to the entirety of [the] rough side of the goods, specifically, a shade of purple represented by a hue angle of approximately 285° *with a lightness measurement of 36 and a saturation measurement of 22* as measured by the X-Rite SP62 portable spherical spectrometer with an observer angle of 10° and with an

illuminant equal to F2 which represents cool fluorescent lighting. The mark is lined for the color purple and color is claimed as the mark. The dotted lines merely indicate the position of the mark on the goods and do not form part of the mark.

Opposer has opposed these amendments to applicant's identification of goods and description of its mark.

Regarding the third amendment to the application and the second to the description of the mark, opposer argues that "the description matches almost none of the products sold by 3M, and 3M can not rely on its sales of non-matching products to establish distinctiveness of the color as described" in the amendment. Brief at 2-3.

Applicant responds by arguing (brief at 34-35) that:

[T]he fact that 3M's internal color measurement guidelines and its proposed third amendment do not match up with absolute precision is immaterial. This naturally is going to be the case because Applicant's internal 3M Purple measurement guidelines contain slight tolerances (i.e., ranges), necessary in any real world manufacturing process, for what it considers to be an acceptable rendition of the 3M Purple mark – tolerances that 3M could not reflect in its application without (again) being accused of seeking to register multiple trademarks.

Applicant also admitted (Brief at 32) that "these amendments [to the description of the mark] which SG now seizes upon in arguing that 3M Purple is inconsistently defined – are not necessary to issuance of the registration that 3M seeks. The simple fact remains that the color 3M seeks to register appears on the very face of the specimen." *See also* Rowen dep. at 23 ("The deep purple color that we were seeking to

5

register as indicated by the sample that we submitted is a particular color, not a range of colors"). However, we note that the "drawing depicts the mark sought to be registered." 37 CFR § 2.52.

In this case, the board has already determined that "applicant has restricted the mark to a single, clearly defined shade of purple, and that the description, as amended, will govern applicant's rights. Applicant's sandpaper in other shades of purple is outside the purview of the involved application." Decision on Summary Judgment dated November 6, 2003 at 5 (citation omitted). We do not find that this third amendment in the case and second amendment to the description of the mark clarifies the issues in this case; rather it has led to more confusion. Applicant, itself, admits that it is unnecessary, and therefore, we deny the second amendment to the description of the mark (third amendment to the application).[2]

Turning next to applicant's motion to amend its identification of goods, we note that its goods were

---

[2] Hopefully, cases like this, in which considerable effort is expended trying to describe the specific color of the mark, are headed for extinction. Current USPTO rules now require that if "the mark includes color, *the drawing must show the mark in color*, and the applicant must name the color(s), describe where the color(s) appear on the mark, and submit a claim that the color(s) is a feature of the mark." 37 CFR 2.52(b)(1) (emphasis added). *See also* TMEP § 807.07(a)(1) (4th ed. April 2005) ("For applications filed on or after November 2, 2003, the Office does not accept black and white drawings with a color claim, or drawings that show color by use of lining patterns").

originally identified simply as "sandpaper."  Applicant now
seeks to narrow or clarify its goods by adding the phrase
"namely, coated abrasives with either paper or cloth
backing."  Opposer argues that the motion to amend is
insufficient, because applicant has not consented to
judgment with respect to all the removed goods; it has not
made a showing that the amendment changes the nature and
character of the goods; and it is a commercially
insignificant distinction.  Opposition to Motion at 5-6.

In response, applicant submitted the following entry
from *The New Encyclopedia Britannica* "sandpapers (coated
abrasives) are the next most significant abrasive product
[after the grinding wheel].  They consist, basically, of a
single layer of abrasive particles held to a flexible
backing material.  Manufacture begins with huge rolls of
backing material, either paper, cloth, or a combination of
the two."  Applicant submits that the amendment was a
clarification and not a limitation of the identification of
goods.  Opposer's witness (its former business manager and
technical advisor) pointed out that the term "sandpaper" is
an "outdated" term.  R. Herron dep. dated April 10, 2001 at
26 ("Sandpaper is an outdated term.  It's a slang for coated
abrasives… It is still used sometimes interchangeably with
coated abrasives.  It's just an old term back from the days
when people used to make abrasives by taking a piece of

7

paper and throwing a little glue on it and throwing some sand on the surface"). Because applicant's amendment to its identification of goods is a clarification (37 CFR § 2.71(a)) that helps narrow the issues at trial, it is appropriate that we grant the motion to amend applicant's identification of goods.

<u>Standing</u>

Opposer's evidence of its use, by itself or through its subsidiaries, of various colors on coated abrasives establishes its standing to oppose this application.

> It is recognized that a party need not be a manufacturer or seller of the goods in connection with which a descriptive, misdescriptive, or merely ornamental designation is used in order to object to the registration thereof. It is sufficient that the party objecting to such registration be engaged in the manufacture and/or sale of the same or related goods and that the product in question be one that could be produced in the normal expansion of that person's business. If the designation in question is found to be merely descriptive, merely ornamental or the like, damage is presumed since a registration thereof with the statutory presumptions afforded the registration would be inconsistent with the right of another person to use these designations or designs in connection with the same or similar goods as it would have the right to do when and if it so chooses… Thus, opposer as a competitor of applicant is a proper party to challenge applicant's right of registration.

*Federal Glass Co. v. Corning Glass Works*, 162 USPQ 279, 282-83 (TTAB 1969). *See also* 3 *McCarthy on Trademarks and Unfair Competition*, § 20:11 (4th ed. 2007) ("Standing to oppose is presumed when the mark sought to be registered is allegedly descriptive of the goods and the opposer is one

who has a sufficient interest in using the descriptive term in his business").

Issues

We start by pointing out that this case involves an application in which applicant seeks to register a shade of purple for coated abrasives under the provision of Section 2(f) of the Trademark Act. The opposition to registration is based on opposer's claims that applicant's mark has not acquired distinctiveness and that the color is functional and, therefore, is not registrable.

Acquired Distinctiveness

We will begin by discussing the issue of acquired distinctiveness, which presents a better vehicle for setting out the evidence in the case, although the facts here are also often relevant to the functionality issue. As we will explain below, we find that applicant's mark has not acquired distinctiveness.

We note that applicant is seeking the registration of "a distinctive purple color." Applicant refers to the color as "deep purple." Applicant's Brief at 1, 3, and 5. Eleven years after its asserted date of first use, applicant set out guidelines for the use of this purple color. 3M did not establish guidelines for the use of its deep purple abrasive products until approximately December 2000. Rowen dep. at 8 ("I was responsible for documenting and developing

9

guidelines around management of the Purple brand and communicating that within our organization. Q. Around what time period was this? A. Late 2000. I think the documents were published in December"). Even with the guidelines in place, the appearance of applicant's color on its goods has not been universally consistent.

> Q. I am going to show you what's been already previously marked as **Doeksen Exhibit 29**, and ask you can you identify that?
>
> A. It appears to be a sample of 961UZ.
>
> Q. Is that the shade of purple that according to your understanding 3M is seeking to register?
>
> A. Yes.

Rowen dep. at 8 (emphasis added).

> Q. Directing your attention to Rowen Deposition Exhibit 7, sir, does that include the claim on the back that the color purple is a trademark of 3M?
>
> A. Most of it
>
> Q. Now, I would like you to compare Rowen Exhibit 7 with **Doeksen Exhibit 29**, which your counsel showed you previously. Visually, sir, are these products the same?
>
> A. No, there are some differences.
>
> Q. What are the differences visually between Doeksen Exhibit 29 and Rowen Exhibit 7, sir?
>
> A. The backing and the backing color are different. It appears much lighter in color.
>
> Q. What appears much lighter in color, sir?
>
> A. The face surface of the abrasive…
>
> Q. Does it appear visually different?

10

A. Yes, it does.

Rowen dep. at 39-40 (emphasis added).  *See also* Rowen Ex. 8.

Background:

At this point, it would be helpful to provide some background on abrasives.  "Abrasives are materials that remove other materials."  R. Herron dep. dated March 29, 2005 at 20.  "There is almost nothing that doesn't require abrasives at one point in the operation."  R. Herron dep. dated March 29, 2005 at 21.

Fortunately, there is a document of record published by the Coated Abrasives Manufacturers' Institute (CAMI),[3] a brochure entitled "Coated Abrasives:  Modern Tool of Industry – A Series of Application and Informational Brochures," which explains the making and use of coated abrasives.  R. Herron dep. dated March 29, 2005 Ex. 1 ("*Coated Abrasives*").  Both applicant and the Norton Company (opposer's subsidiary) are identified as members of CAMI.  *Id.*

Abrasives are often referred to as "coated" or "bonded" abrasives.  Coated abrasives consist of:

> abrasive particles, or grains, fastened to a flexible backing by a film or adhesive… Backings might be film, paper, cloth, fiber, or a combination of these materials.  The bonding agents, or adhesives, can be any number of different glues and resins.  And the abrasive grains in general use today range from natural and synthetic minerals such as emery, garnet and crocus

---

[3] CAMI is now apparently the UAMA.  Herrin dep. dated March 29, 2005 at 32 (United Abrasives Manufacturers' Association).

11

through aluminum oxide, silicon carbide and the new zirconia alumina and ceramic alumina abrasive combinations.

*Coated Abrasives* at 2, R. Herron, Ex. 1.

Thus, a coated abrasive consists of a backing material, a bonding agent, and an abrasive grain. In addition, the CAMI brochure refers to another abrasive product called "nonwoven" or "non woven" abrasives. "Non woven synthetic fabrics as coated abrasive backings came onto the scene in the mid-1970s… Today's upgraded versions have found some use in certain specific applications, particularly in finishing applications. Coated abrasive products featuring non-woven backings are available in a variety of shapes, forms and sizes including belts for both metal and woodworking markets." *Coated Abrasives* at 9, R. Herron, Ex. 1.[4]

"Coated abrasives" are distinguished from "bonded abrasives." With bonded abrasives, the abrasives' grains are "bonded together to form the actual product shape, as is a bonded abrasive wheel," while coated abrasives are coated to a surface. *Coated Abrasives* at 2, R. Herron, Ex. 1. *See also* R. Herron dep. of March 29, 2005 at 22 ("The primary

---

[4] We note that the witnesses differed as to whether nonwoven abrasives are a type of abrasive distinct from coated abrasives. *See, e.g.*, Kelly dep. dated June 10, 2005 at 74 ("Is that a coated abrasive product? A. No. Q. What is it, do you know? A. Nonwoven abrasive product in the Scotch Brite family of products is how I know it"); R. Herron dep. dated March 29, 2005 at 22 ("[S]ometimes nonwovens are talked about as a separate business unit"); and R. Herron dep. dated March 29, 2005 at 28 (Nonwoven abrasives are "definitely" coated abrasives).

difference between the two is that coated abrasives are conformable so if you need an abrasive product that will conform to a surface you pretty much have to use a coated abrasive material. That's because of the flexible nature of the backing. Bonded abrasives can be shaped but will not deform or shape on their own").

Coated abrasives are distinguished, inter alia, by whether the coated abrasive is a "closed" or "open" coat. "In a closed coat product, the coat side surface of the backing is completely covered with abrasive grain… An open coated product has the abrasive grains spaced at predetermined distances apart from one another, covering approximately 50% to 70% of the coated surfaces." *Coated Abrasives* at 21-22, R. Herron, Ex. 1.

"In addition to the type of abrasive used, grit size is another variable. Coated abrasives are made in a wide range of grits ranging from the very rough and coarse grit to very fine micron and sub micron sizes." *Coated Abrasives* at 2, R. Herron, Ex. 1.

The abrasives used in producing coated abrasives come in a variety of colors.

> Aluminum oxide – "Depending on the titanium content, it ranges in color from white to dark brown… It is particularly well adapted to high tensile materials such as carbon and alloy steels, tough bronze, and hard woods." When the common additives, titanium dioxide and chromium dioxide are used the grains are "black or pink in color." *Coated Abrasives* at 17, R. Herron, Ex. 1.

13

Silicon Carbide – it "is bluish black in color."  It "is ideal for sanding, polishing, and finishing non-ferrous metals (aluminum, brass, bronze, magnesium, titanium, etc.) as well as glass, rubber, plastics, fibrous woods, enamel and other low tensile, relatively soft materials."  *Coated Abrasives* at 17, R. Herron, Ex. 1.

Garnet – "For use as coated abrasives, the reddish-brown grains are crushed and specially treated with heat to become tougher and sturdier…  It is widely used in furniture manufacturing, particularly in finishing operations."  *Coated Abrasives* at 18, R. Herron, Ex. 1.

Emery – "a natural composite of corundum and iron oxide, emery is very dark gray in color…  Emery is used for general maintenance and metal polishing, and in very fine grits, for highly technical polishing where close tolerances are essential."  *Coated Abrasives* at 18-19, R. Herron, Ex. 1.

Crocus – It "forms the basis for the well known rouge used in many fine polishing and buffing operations and is used in the jewelry trade and markets where gold and other soft rare metals are polished."  *Coated Abrasives* at 19, R. Herron, Ex. 1.

Applicant's *3M™ Floor Sanding, Finishing, Installation and Repair Products* brochure also indicates that abrasives come in several natural colors:

Understanding Coated Abrasives

There are 4 basic types of minerals used to make abrasives for the paint and construction industry; garnet, aluminum oxide, silicon carbide and ceramic aluminum oxide.

Garnet – A natural, reddish brown mineral…
Silicon Carbide - Very hard, black and shiny…

Aluminum Oxide - A synthetic mineral, gray-brown in color…

Zelgart dep. Ex. 27.

14

Facts:

Abrasives come in a variety of colors. The displays in several manufacturers' catalogs of record show different abrasives in a rainbow of colors. *Standard Abrasives 2000*, Kelly dep. Ex. 14 and 15 (Pictures of different color abrasives). *See, e.g.*, Lynn Ex. 7 (Mercer Abrasives – "These blue, cloth-backed abrasives last up to four times as long as conventional flooring products"); Kelley dep. dated June 10, 2005 at 70 (Purple bonded-type abrasives); and R. Herron dep. dated March 29, 2005, Ex. 40 (Norton *Stock Abrasive Products* catalog showing a variety of abrasives in numerous colors).

> Q. Okay. And you got – and MIPOX [a third-party abrasive manufacturer] does make coated abrasives in different colors.
>
> A. Yes, we do.
>
> Q. Okay. Have you seen any other companies that make different color-coated abrasives like you, for example, at a trade show or something like that?
>
> A. Yes, I have seen other competitors making abrasive films in different colors.
>
> Q. Okay. Do you know what colors you've seen?
>
> A. Just off the top of my head, I have seen colors in the blue, purple, reddish, greenish color…

Kodaka dep. dated April 20, 2005 at 10.

Coated abrasives, including paper and cloth coated abrasives, come in a variety of colors. Turner dep. at 27 ("Blue, red, reddish, black, light blue, gold"); Kelly dep.

at 68, Ex. 14, p. 17 (Different color Resin Fibre Discs, included purplish blue, for coated abrasives); Kelley dep. dated June 10, 2005 at 41 (Coated abrasives come in many colors); Kelly Ex. 15 (Shur-Kut Catalog – different color abrasives); and Kodaka dep. dated April 20, 2005 at 9:

Does MIPOX sell coated abrasives in different colors?

A. Yes, we do.

Q. And do you know which colors you sell or –

A. In general we sell all the major color types:  blue, green, yellow, brown, purple, red.

Purple is one of the colors that is used in association with coated abrasives including paper and cloth coated abrasives.  R. Herron dep. dated March 29, 2005 at 88-90 (R215/R255 [identical to R228 except that is a closed coat] is an "open coated aluminum oxide cloth belt."  It is a coated abrasive that has been sold by opposer or its predecessor since long before the witness came to the company.  It looks purplish.  It "dates back to the fifties."  This open coat sample "is aimed primarily in the woodworking market").  *See also* Sternberg dep. at 21, Ex. 115 (Purple film-backed coated abrasives have been used in the dental industry); Kodaka dep. dated April 20, 2005 at 11 ("What products do you make that are purple?  A. We have three main products.  We have one coated abrasive that has aluminum particles in it; we have another one that has diamond particles in it; and we have a third one that has

16

silicon carbide particles"). *See also* Sternberg dep. dated

April 7, 2005 at 14-16:

> Q. Okay. Has Moyco [Moyco Technologies - a third-party abrasive manufacturer] during the course of doing business ever made purple-colored coated abrasives?
>
> A. Yes.
>
> Q. Okay. And how long have they been making purple color abrasives?
>
> A. Since I've been there… I can say without question since '74…
>
> Q. The purple coated abrasives that you are familiar with that Moyco made, can you tell me what kind of backings those had?
>
> A. Film backing and paper backing…
>
> Q. And did you sell purple coated abrasives in commercial quantities?
>
> A. Yes

*See also* Sternberg dep. dated April 7, 2005 at 23 and

Ex. 121 (Describing Exhibit 121 as "purple, a paper backing,

probably went into the beauty industry") and 27-28 and Ex.

134 (Describing Exhibit 134 as "Paper backed, aluminum

oxide, Moyco product, was made for a long time, we still are

making it, and are commercially selling it. And I would

believe this would also have gone into the beauty

industry").

Opposer was selling its product identified as R228

since at least 1967. R. Herron dep. dated March 29, 2005 at

17

74 ("[I]n my mind it's very clearly purple,[5] [and] they were selling it before I joined the company in 1967"). *See also* R. Herron dep. dated March 29, 2005 at 77-78 and Ex. 10[6] ("That's the special made depilatory product for removing hair -- for removing hair from women's and hairy men's I guess arms and legs. It is the purple material." It has been sold since before 1967); and Sternberg dep. at 18-20 (Ex. 111-114 and 121, purple paper coated abrasives).

---

[5] It is clear from reviewing the examples of abrasives in the record and the various witnesses' description of their colors that there is a great deal of subjectivity in the witnesses' characterization of these colors. We have no doubt that some of these products can be identified in various ways. Opposer's color expert testified that "a color name is a very personal – is a very personal thing." Rosen dep. at 55. Testifying as a layman, in response to a question on cross-examination, Dr. Rosen agreed that SG's sample Q135 could be described as "a very light purple or a lavender." Rosen dep. at 52. In its Reply Brief at 22 (citations to record omitted), opposer points out that the color of the products can be described in various ways:

> 3M states that SG's witness, Mr. Herrin, called the SG T247 "black." In fact, Mr. Herrin stated: "I could say it's black. You can say it's a dark shadow [sic] of purple. There is a variety you would say with it." Further misrepresentation of Mr. Herrin's testimony occurs where 3M alleges that Mr. Herrin said that the SG R228 is a "shade of maroon." Mr. Herrin states, quite clearly, in response to 3M's question "Anything else, any other products that you maintain are purple?" that the R228 is "purple." It is only when 3M's counsel asks him whether it "could be a shade of maroon," that he says it is possible.

To clarify, we add that the witness was actually asked "would" it be described as maroon and the witness replied that "you could say…." J. Herrin dep. dated August 22, 2005 at 18.

[6] In response to a question about this product (Exhibit 10), the witness was asked about "the people who have a need for a nail file or depilatory product." R. Herron dep. dated March 29, 2005 at 170. The witness stated that: "I said the woman who uses them for her nails would not refer to it as sandpaper or coated abrasive. Our customer, however, would refer to it as coated abrasive." R. Herron dep. dated March 29, 2005 at 170-71.

Applicant, itself, sells a wide variety of coated abrasives in various shades of purple. For example, its automotive aftermarket brochure shows a variety of shades of purple products. *See* DeNuccio dep. June 28, 2005 at 52 ("They appear to be different shades of purple") and Ex. 7; DeNuccio dep. at 57 (3M sells "film discs [not paper or cloth coated abrasives] in a 600 grit that are purple in color"). *See also* Rowen dep. dated January 17, 2002 at 137-38:

> Q. Has the tag line the color purple is a trademark of 3M ever been used on a product which is not deep or dark purple in color?
>
> A. Yes…
>
> Q. Is the tag line the color purple is a trademark of 3M ever used on a product that is lighter than a dark or deep purple?
>
> A. Yes.
>
> Q. What products?
>
> A. Products with a white Sterrite [stearate?] on them…
>
> Q. Is the tag line the color purple is a trademark of 3M used on a product that is not paper or cloth backed?
>
> A. Yes.

Abrasives come in different colors for a variety of reasons. Some colors and shades occur naturally and others result from the manufacturing process. For example, grit affects the color of coated abrasives.

> Q. And the grit impacts on the color of the disc, sir, is that your testimony?

19

> A. It has – yes, it does. It makes it look darker or in some cases lighter.

DeNuccio dep. at 44. *See also* DeNuccio Ex. 8 (04060) (3M pads are different shades of purple); R. Herron dep. dated March 29, 2005 at 38 ("[B]oth the backing, the abrasive grain and the adhesive can all have some impact on color"); Lain dep. dated July 22, 2005 at 77:

> Q. Do you think that depending on the grit size, it would affect the shade of purple? Like, if something 30 grit or 40 grit – let's say 40 grit and something's 120 grit, would it be darker if it's the 40 grit and lighter if it was the 120 grit?
>
> A. Yes.
>
> Q. And why is that?
>
> A. Because of the fact that the resins which hold the mineral on there will take and absorb more of the color so you have more voids in the coarser grits than you do in the finer grits.
>
> Q. Okay. So as the grits would go up, it would get lighter in color?
>
> A. It could.
>
> Q. It could?
>
> A. Also, if you change lots of color, it changes color.

Some colors are specified by the purchasers. R. Herron dep. dated March 29, 2005 at 43 ("[W]e have a request from [a major corporation] right now who insist they want a purplish product from us and that's the only color they are willing to accept"). *See also* Sternberg dep. dated April 7, 2005 at 85, Ex. 657 and 658 ("And they have requested the color purple for color coated abrasives? A. That's right").

20

Q. Can you speak to the sales for any of the particular [Moyco] products that you viewed this morning?

A. Yes, I know certainly in the 90's, probably the 80's and maybe into the 70's, and whatever industries we were selling into, that we offered the color charts to the customers and they picked whatever they wanted. Could be any color. Some of the colors we looked at have purple in various shades, the purples were identified.

Sternberg dep. dated April 7, 2005 at 101.

Some colors are applied by the manufacturers to enable consumers to distinguish the grit size of the abrasive, particularly in a multi-step operation. Sternberg dep. Ex. 664 ("Moyco films are color-coded for easy identification"). Sternberg dep. at 96 ("Do a lot of companies use color coding systems other than yourself, do others use color coding systems. A. Yes"); Wimer Ex. 17, p. 16 (Norton uses color-coding for non-woven pads). Because workers in furniture plants are "from Mexico and overseas and can't speak English and can't read what's on the back of the belts, color has become more important for that reason." R. Herron dep. dated March 29 2005 at 61. *See also* Kodaka dep. dated April 20, 2005 at 19-20:

It's general knowledge that some end users, customers, would like to see the abrasive films, in different color coating so that their operators would not make a mistake in applying the wrong abrasive film for their specific application…

For instance, the largest application would be the fiberoptic application for MIPOX, and usually they would use maybe two or three different abrasives going from course [sic coarse?] to fine, and they would like to see the two or three different abrasive films in

21

different colors so that they would not use the wrong abrasive in the wrong order.

Kodaka dep. dated April 20, 2005 at 19-20.

Applicant also uses color, including purple, to distinguish the application or use of its abrasives.

> Q. The product is described as maroon, slash, purple. Do you see that, sir?
>
> A. Yes.
> ***
>
> Is that an instance of 3M using purple to indicate applications?
>
> A. For nonwovens, yes, and not for coated. That's when – when I answered the question before, I was referring to coated abrasives. The nonwovens do have color that indicates application and how coarse the – how coarse the nonwoven is.

DeNuccio dep. dated June 28, 2005 at 62 and 64. *See also* Wimer dep. Ex. 14 p. 12 ("Scotch-Brite pads [non-woven synthetic construction floor pads] are color-coded to easily indicate the aggressiveness of the cut. The lighter the pad color, the less aggressive the cut; the darker the color, the more aggressive the cut") (white, pink, red, maroon); DeNuccio dep. dated June 28, 2005 at 59-60 ("Q. And looking at the Scotch-Brite scuff sponges, does color indicate the application of the product? A. The — these are nonwoven abrasives and there is some – there is some color coding for these nonwovens"). Applicant at first test-marketed its SandBlaster sandpaper using the color purple to designate that it was for use on bare surfaces. Rowen dep. dated June

22

9, 2005 at 29 and Ex. 6 ("Q. It also shows purple in connection with other colors that are also used to indicate the application for the product; is that correct, sir? A. Yes").

We point out that, while applicant has limited its goods to cloth and paper cloth abrasives, it has not limited its goods to any particular industry. Indeed, cloth and paper coated abrasives are sold alongside film and other coated abrasives, including nonwoven abrasives, in the same industries. DeNuccio dep. at 51 (3M's Automotive Aftermarket Division (AAD) sells abrasives with paper and film backings); DeNuccio dep. at 60 ("Q. Are the nonwoven products sold by the AAD sold by the same distributors as the coated abrasives? A. Yes").

> Q. Based on your experience is there any overlap between the customers for the film products and the cloth and paper products?
>
> A. Absolutely.
>
> Q. What is the nature of the overlap?
>
> A. There are a number of applications where film products and paper- or cloth-backed products compete in the marketplace and depends on the desires of the customer and the performance of the individual product application. One will provide more benefit than the other. But we do have, for example our A275 product which completes [sic competes?] everyday with the 3M film products in the marketplace. And it's growing a product line for us often at the expense of 3M's film products.

J. Herrin dep. dated March 30, 2005 at 14.

23

Can you use some film products for the same application as paper products?

A. If you are talking comparable grit sizes, yes, very definitely. And also you have to consider the backing weights when you talk about the paper product. We have light papers, we have light films, we have heavier films, we have heavier paper.

R. Herron dep. dated March 29, 2005 at 177-78. *See also* R. Herron dep. at 178 ("Well, film is the preferred product for doing cam shafts now but paper was the preferred product prior to the introduction of film").

Applicant similarly markets film abrasives with paper and cloth abrasives.

3M Woodworking Reference Manual
Abrasives for the woodworking industry
Stroke Sanding
Cloth, Paper and Film Products
*Cloth*
…
3M™ Xodust cloth 200 DZ…
*Paper*
…
Xodust paper 363UZ
Xodust paper 461UZ
*Film*
Xodust film 362RZ

Doeksen dep. Ex. 62, p.7 (3M 02969 – Maroon, Blue, and Gray). *See also* Doeksen dep. Ex. 62, p. 5 (Final Finish Wide Belt Sanding (Cloth – Regal Xodust cloth 970DZ, Paper – Xodust paper 461UZ, and Film – Xodust film 362RZ)). *See also* Doeksen dep. Ex. 63, pp. 17-19 (3M 00604-06) (3M's Stikit System consists of cloth, paper, and film coated abrasives).

Discussion - Acquired Distinctiveness

The Supreme Court has held that color alone can function as a trademark. *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 39 USPQ2d 1161, 1162 (1995) ("We conclude that, sometimes, a color will meet ordinary legal trademark requirements"). The Supreme Court has also made it clear that "with respect to at least one category of mark -— colors -- we have held that no mark can ever be inherently distinctive." *Wal-Mart Stores Inc. v. Samara Brothers Inc.*, 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000). Applicant, in this case where it seeks registration of its purple color applied to coated abrasives, requests registration under the provision of Section 2(f) on the ground that it has acquired distinctiveness. Therefore, applicant's mark is only registrable on the Principal Register if applicant has submitted sufficient evidence that its mark has acquired distinctiveness. "Distinctiveness is acquired by 'substantially exclusive and continuous use' of the mark in commerce." *In re Owens-Corning Fiberglas Corporation*, 774 F.2d 1116, 227 USPQ 417, 424 n.11 (Fed. Cir. 1985).

Inasmuch as the trial is complete and opposer has submitted evidence challenging applicant's claim of distinctiveness, the burden of establishing that the mark has acquired distinctiveness rests with applicant.

Yamaha strenuously asserts in its brief on appeal that the ultimate burden of persuasion under Section 2(f) on

> the issue of acquired distinctiveness is on Hoshino as applicant. We completely agree. "The burden of proving secondary meaning is on the party asserting it, whether he is the plaintiff in an infringement action or the applicant for federal trademark registration." 1 Gilson, *Trademark Protection and Practice* § 2.09, at 2-72 (1987)… As this court observed while reviewing an opposition proceeding in *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1405, 222 USPQ 939, 942 (Fed. Cir. 1984), the "one seeking to register [the proposed trademark] bears the burden of showing secondary meaning under Section 2(f)."

*Yamaha International Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1006 (Fed. Cir. 1988).[7]

Furthermore, as our principal reviewing court has observed: "By their nature color marks carry a difficult burden in demonstrating distinctiveness and trademark character." *Owens-Corning*, 227 USPQ at 424.

In support of its contention that its color purple has acquired distinctiveness, applicant points to the following evidence. As direct evidence, applicant presented the testimony of four witnesses. The first was Thomas Kelley, President of Kelley & Kelly Industrial Supply, which is a company that caters "to the manufacturing community in and around central New York." Kelley dep. dated June 10, 2005 at 9. Mr. Kelley identified coated abrasives as a 3M product by the purple color. Kelley dep. dated June 10,

---

[7] "[I]t appears to us that one opposing a Section 2(f) registration published for opposition on the basis of that section must have at least the initial burden of challenging or rebutting the applicant's evidence of distinctiveness made of record during prosecution which led to publication of the proposed mark." *Yamaha*, 6 USPQ2d at 1004.

26

2005 at 20.   Mr. Kelley's company has eleven employees and does business exclusively in New York State.   Kelley dep. dated June 10, 2005 at 33.

Applicant's second witness was Paul Wimer, General Manager of Long Flooring.   This company is a small business in the Washington, D.C. area with approximately 25 employees.   Wimer dep. dated June 21, 2005 at 59.   The witness testified that "our sales people and our customers know that the purple color is 3M."   Wimer dep. dated June 21, 2005 at 52.

The third witness was Charlie Boyd Hutton.   Mr. Hutton is the sole proprietor of Hutton Auto Craft Specialties, which does "body and paint work on high-end specialty cars, a lot of hand-fabricated street rods and then existing older cars."   Hutton dep. dated May 24, 2005 at 9.   The witness appeared as a body shop manager on The *American Hot Rod* series on Discovery Channel as well as the show *Rides*. Hutton dep. dated May 24, 2005 at 13-14.   The witness uses "all 3M abrasives" and he uses "primarily one" jobber to order abrasives.   Hutton dep. dated May 24, 2005 at 23 and 27.   He reports that:   "When I order the sandpaper, they all know who I am and they know exactly what I use; so when I order up, I order the 3M purple 40 grit, and that's what I get."   Hutton dep. dated May 24, 2005 at 27.   Mr. Hutton testified that:

27

Q. But you mentioned earlier that this was a 3M product; is that right?

A. Yes, because of the dark purple.

Q. And are you able to tell that based on color alone?

A. Yes. As far as my knowledge, 3M is the only one that actually makes the purple sandpaper, the dark purple in the automotive sandpaper line.

Hutton dep. dated May 24, 2005 at 33.

The fourth witness was Sprigg Lynn, President of Universal Floors, Incorporated, a wood flooring contractor, also in the Washington, D.C. area that employs between 30 and 40 people. Lynn dep. dated May 23, 2005 at 61. Mr. Lynn testified that "3M has a fine quality paper, we've used it quite a bit, and I believe in 3M." Lynn dep. dated May 23, 2005 at 9. Furthermore, when asked "how do you know that's 3M paper?," he responded: "The deep, dark colored purple, I have never seen any other manufacturer with anything that resembles this paper." Lynn dep. dated May 23, 2005 at 39.

While we have considered this direct evidence of trademark recognition, we find that it is unimpressive. The market for coated abrasives is a multi-million dollar market. "At best, these affidavits merely assert that affiants believe that what amounts to a very small portion of the purchasing public identify these [goods] as those of applicant" because of the mark in the application. *In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1, 2 (CCPA

28

1961).  This limited evidence does not provide much support to demonstrate that applicant's shade of purple has acquired distinctiveness as a trademark for coated abrasives.[8]

Applicant's expert witness was Darris Turbyfill, "chairman of the furniture technologies division at Catawba Valley Community College in Hickory, North Carolina." Turbyfill dep. dated June 29, 2005 at 2.  Mr. Turbyfill, when shown several products, testified that he "would recognize this as a 3M due to the dark purple color." Turbyfill dep. dated June 29, 2005 at 36.  Furthermore "when I see a dark purple-colored sandpaper, I naturally assume and naturally think of that as a 3M product, because of that – because of the marketing that they have done with this color and their product."  Turbyfill dep. dated June 29, 2005 at 38.  Furthermore, Mr. Turbyfill testified:

> Q. In your experience, does the deep shade of purple have any significance in the furniture industry?
>
> A. As far as these belts are concerned, this deep purple – when I'm in a furniture plant and I see a deep purple belt, I identify that as a 3M product.

Turbyfill dep. dated June 29, 2005 at 50.

Opposer argues that Mr. Turbyfill's expert report "was written by counsel and his testimony is replete with errors

---

[8] Applicant's witness also maintained that a television home improvement show host stated that he "loved those purple belts." Doeksen dep. at 11, Applicant's Brief at 6.  Even if this was not hearsay, this equivocal statement would not be entitled to much weight.

29

of fact.  His testimony is entitled to no weight."

Opposer's Brief at 18-19 (citation to record omitted).  We do note that Mr. Turbyfill testified as follows:

Q.  What portions of Turbyfill exhibit 1 were written by counsel?

…

A. The report was written by counsel and was reviewed by me to make sure that everything about the report that was written was accurate based upon my experience in the industry and what we had talked about.

Q.  Did you make any changes to the draft of the report that was provided to you by counsel?

A. I think I may have made some, but I can't remember. There may have been some small – nothing as far as – nothing major that I can recollect that was changed after review.

Turbyfill dep. dated June 29, 2005 at 54.[9]

However, inasmuch as Mr. Turbyfill testified and was cross-examined, we will primarily refer to his testimonial evidence, and we do not need to rely on his expert witness report.  We also note that Mr. Turbyfill's area of expertise was confined to the furniture-making sector.

Furthermore, applicant also submitted 55 form declarations from individuals.  A sample declaration is set out below:

---

[9] Interestingly, applicant's expert witness could not recall 3M in its advertising referring to its purple product as "distinctive" or "deep" purple.  Turbyfill dep. dated June 29, 2005 at 85.

<u>Customer Statement</u>

I am at least 18 years old, and I purchase products of various manufacturers.  I am generally knowledgeable about sandpaper and other abrasive products.  I am familiar with purple-coated sandpaper/abrasives, and I associate the distinctive purple color exclusively with sandpaper products of 3M™ and no other manufacturer.  I verify under penalty of perjury that the foregoing is true and correct.

Doeksen dep. Ex. 42.

Opposer argues that the Customer Statements:

[D]o not identify for whom the declarants work, or in what capacity, how long they have worked there, what 3M products they purchase or what other companies' products they purchase.  There is no contact information to verify who these individuals are, with four exceptions that appear to be written in later on the forms by some unidentified person(s), and may or may not be accurate.  The declarants do not specify or describe the shade of which purple they are supposed to be referencing or the product backing.

Opposer's Brief at 21-22.

Applicant, in its brief, has apparently withdrawn its reliance on these statements:

SG focused instead on certain "consumer statements" that 3M secured during the prosecution, arguing that these statements are entitled to no weight with respect to the distinctiveness calculus.  While 3M disagrees with SG's contention, particularly where such statements are commonly used to demonstrate secondary meaning, 3M has instead presented direct evidence from several third-party witnesses such as Messrs. Kelley, Wimer, Hutton and Lynn to establish acquired distinctiveness here.

Applicant's Brief at 15 n. 8.  *See also* Reply Brief at 2 n.1 ("Given 3M's implied abandonment of the form customer statements as evidence, SG sees no need to address them further").  Even if applicant was still relying on these

31

statements, these statements would be entitled to little weight due to their cursory nature and the lack of much basic information, such as even where most of the customers work. *In re Pacer Technology*, 338 F.3d 1348, 67 USPQ2d 1629, 1633 (Fed. Cir. 2003).

Applicant also argues that each "distributor receives customer orders in its own way and by all manner of means such as fax, email, phone, or in-person… The one constant in terms of ordering 3M Purple product – a constant that SG cannot dispute – is that real customers ordering real products do so using two criteria: color and grit." Brief at 20. Applicant's argument would have been stronger if it had presented at least some copies of emails or faxes that supported its argument. Even concerning customers' phone or in-person orders, there is little actual specific customer evidence. One of the only specific examples of a customer who does order by color and grit is set out below. However, it is not clear if this type of ordering is actually the result of the fact that the witness is a very small business who deals with one or two distributors. *See* Hutton dep. dated May 24, 2005 at 27:

> A. Yes. I use the 3M purple on every product I do every – every car because that is actually the product of choice.
>
> So all my sandpaper, when I order it, it's the purple, the dark purple.

32

Q, How many jobbers would you say you currently use to order abrasives?

A. Primarily one. But I also use another, another one when my primary jobber is out of stock.

Q. Do the jobbers know that you use 3M's products?

A. Yes, they do. When I call up and order the sandpaper, they all know who I am and they know exactly what I use, so when I order up, I order the 3M purple 40 grit, and that's what I get.

This purchaser's testimony appears to be similar to a regular patron of a bar ordering a drink by simply saying: "The usual." This type of testimony is not evidence that other customers without a prior relationship with a 3M jobber regularly order coated abrasives by saying "3M purple 40 grit" just as new customers at a bar do not order by saying "The usual."

Applicant also provided evidence of its sales and advertising. It is clear that applicant has advertised in various trade magazines and promoted the color purple. One ad, for example, features purple "thought" balloons with the headline "What ordinary sandpaper can only dream to be." This is followed by the statement: "Introducing the purple abrasive belt from 3M. We've taken ordinary sandpaper and made it extraordinary." *FDM Furniture Design & Manufacturing*, Doeksen dep. Ex. 15 (An asterisk after the purple balloons states that "The purple color is a trademark of 3M." Another ad in *Hardwood Floors* features a purple lion with the phrase "Purple reigns" and the ad ends with

the suggestion to "Just ask for them by color."  Wimer dep. Ex. 3.[10]

Applicant has also included a legend on its coated abrasives.  There are two different versions of the  legend: "THE PURPLE COLOR IS A TRADEMARK OF 3M" and "The Color PURPLE is a Trademark of 3M."  *See, e.g.*, Kelley dep. Ex. 4, Doeksen dep. Ex. 48, Turbyfill dep. Ex. 7, and Rowen dep. Ex. 3.  This legend has appeared on coated abrasives that are not cloth or paper backed, and it has also appeared on coated abrasives that are different shades of purple. Applicant has also promoted its products by using the following slogans:  "Ask for it by color, not by name" and "If it's Purple, it's from 3M."  Doeksen dep. dated June 7, 2005 at 41-42 and 69.  *See also* Doeksen dep. Ex. 36 (00441)(01739) ("Ask for it by color, not by name") and 41 (3M press release – "If it's purple, It's from 3M – Purple discs join growing family of 3M purple abrasives").

Applicant also points out that it has spent several million dollars promoting its purple products and that the sales of its products have grown steadily.  However, we note that even more extensive evidence of this type was not

---

[10] Another ad in *Hardwood Floors* (Wimer Dep. Ex. 7) contains several references to "choose purple" and "The PURPLE color" as a trademark of applicant but the color of the belts in the photocopy looks significantly different than some of applicant's other purple displays.

necessarily sufficient when the involved mark was a color

mark applied to outboard motors:

> Applicant has sold large numbers of its engines in a
> wide variety of sizes for almost thirty years in only
> one color: black.  As noted above, applicant has spent
> over a hundred million dollars advertising its engines,
> all of which have been black, and three billion dollars
> worth of these products have been sold.  This extensive
> presence in the marketplace is bound to create
> recognition of the fact that applicant's engines are
> black.  The evidence also shows that while applicant is
> not the exclusive purveyor of black outboard engines,
> applicant is responsible for the majority of them.
> That a large portion of the relevant purchasing public
> knows applicant makes black engines is understandable
> under these circumstances.

*British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197,

1203 (TTAB 1993) ("*Brunswick I*"), *aff'd*, 35 F.3d 1527, 32

USPQ2d 1120 (Fed. Cir. 1994) ("*Brunswick II*").  Similarly,

the evidence in this case (some of which we have considered

but not specifically discussed because it is confidential),

which is significantly less impressive than the evidence in

*Brunswick I and II*, is also not sufficient.

While some of applicant's advertising supports

applicant's claim of acquired distinctiveness, inasmuch as

applicant is seeking registration of a color in a field

where color is common, sales and advertising evidence would

ordinarily not be sufficient by itself to demonstrate that

its color has acquired distinctiveness.

Second, a more basic problem with applicant's evidence

concerns applicant's trademark itself.  We have earlier

found that applicant was not applying for multiple marks,

but rather one distinctive shade of purple. In response to opposer's interrogatory requesting that applicant identify each product on which applicant's mark is used, applicant responded by identifying the products with the following identification codes: 3M 740I, 745I, 752I, 761D, 900D, 900DZ, 930DZ, 961UZ, 970DZ, and Imperial 3M Fibre Discs. Applicant's Responses to Opposer's First Set of Interrogatories at 2. Even among these products, there are variations of the shade of the color purple. However, applicant has used a legend that indicates that the color purple (sometimes the Purple Color) is its trademark. Since the ultimate question in this case is whether applicant has shown that its mark has acquired distinctiveness, this type of evidence provides some support to show that applicant attempted to use its mark as a trademark, but it does not show that applicant's mark has actually acquired distinctiveness. Indeed, much of the evidence would indicate to many customers that applicant claims rights in the color purple in general for all types of coated abrasives – a position that applicant strenuously disavows now. Therefore, to the extent that applicant is relying on advertising and customer recognition for products with different shades of purple, this evidence does not support the registration for its specific shade in this application.

36

In addition, opposer has submitted significant evidence and arguments to counter applicant's claim of acquired distinctiveness. For example, opposer has submitted evidence that others are using purple in association with coated abrasives and that others use a color coding system for their coated abrasives. Regarding the statements of applicant's witnesses (Hutton, Kelley, Wimer, and Lynn), opposer points out that none "of the four individuals were offered as experts… Yet, 3M puts forth the testimony of these four individuals and asks the Board, without any case citation, to make the dazzling inference that this is credible direct evidence of acquired distinctiveness." Reply Brief at 3. As we indicated above, we agree that the testimony of these four, non-expert witnesses hardly establishes that applicant's mark has acquired distinctiveness. It is hardly surprising that applicant was able to find four customers or distributors who could associate the specific color purple with applicant. While undoubtedly these witnesses provide some evidence that supports applicant, they do not provide a basis to conclude that a sizable percentage of potential customers recognize applicant's mark as a trademark.

Opposer also introduced a survey to support its position that applicant's mark had not acquired distinctiveness. Opposer's survey expert, Philip Johnson:

> [C]onducted a study of approximately 600 members of the universe of abrasive users and made a determination about whether or not the color purple had any significance to them in terms of trademark significance or source designation…
>
> I found that based on the results of the study, the color purple does not have trademark significance. In other words, it does not identify uniquely a single source, 3M or otherwise, as the source of sandpaper or abrasive products that are purple in color.

Johnson dep. dated April 7, 2005 at 18-19.

Mr. Johnson conducted a survey that involved telephonically contacting users of abrasives. The survey also involved a control. A control is "a twin product attribute[,] service or stimuli that has the same characteristics generally as the test stimuli, but does not have the characteristic that is at issue… it would have all of the characteristics of purple sandpaper but not be purple." Johnson dep. dated April 7, 2005 at 22. For the control in the survey, Mr. Johnson chose orange sandpaper.

As a result of the survey, Mr. Johnson concluded that "when one measures how many people would identify 3M or one company, even if an unknown company, as a single source of purple sandpaper, and you then subtract the similar proportion among people who are asked about orange sandpaper in the control, you end up with six percent, which is about the same level you'd expect just based on noise or error." Johnson dep. dated April 7, 2005 at 34.

Applicant argues that "serious deficiencies with Mr. Johnson's survey render the results virtually meaningless. Above all, because this was a telephone survey, respondents did not even see 3M's Purple mark, and their ability to recognize this mark could therefore not be tested." Brief at 22. Applicant's other significant criticism is that Mr. Johnson used "an inappropriate screening question, which focused on users rather than purchasers of sandpaper." Brief at 22 n. 14.

At first glance, we agree with applicant that it appears to be inappropriate to use a telephone survey when there is a visual component to the mark. However, even in a case involving letter marks with significant stylization, the board, although cognizant of numerous defects with the telephone survey, nonetheless did not find that the survey was "virtually meaningless."

> We recognize that surveys taken by telephone can be, in appropriate circumstances, inherently reliable. However, in this case, given that the marks at issue are design marks which have a substantially similar appearance, much validity was lost when the survey was conducted by telephone. Throughout this decision, we have pointed to this du Pont factor, that is, the substantial similarity of the marks in appearance, which weighs heavily in our analysis. Given the visual similarities, we question why the survey was done by telephone, other than perhaps, of course, for the obvious reasons of cost and time. Although the questions posed to respondents indicated that Hilson and Society used "quite similar looking logo[s]", that characterization is, in our minds, not enough. Simply put, in cases such as this where so much turns on similarities of the marks in visual appearance, survey

39

respondents should be confronted with reproductions of the marks rather than mere descriptions.

*Hilson Research Inc. v. Society for Human Resource Management*, 27 USPQ2d 1423, 1438 (TTAB 1993).

Despite this and other serious weaknesses, the board held that the *Hilson* survey was entitled to "some probative value." *Hilson*, 27 USPQ2d at 1439.

Here, opposer's witness, Mr. Johnson, explained:

[W]hen you do secondary meaning, you want to isolate the attribute that's at issue and remove indicia of origin, in the case of sandpaper, things like whether it's on a belt or it's on a disk or whether it's flat. How people are used to seeing it varies widely depending on how they use sandpaper.

So in order to control for all the variables, the best way to do it is to use a verbal description of purple, which is also consistent with the claim and even the – the writing on the back of some sandpaper samples I saw from 3M that said the color purple is a trademark of 3M.

Johnson dep. dated April 7, 2005 at 21.

Furthermore, opposer argues that using a telephone survey and the term "purple" would actually be more favorable to applicant because respondents would not be limited to any shade of purple. "If a respondent were familiar with the light-appearing stearate product, or the reddish-purple 745I product or the 930DZ product, the respondent could express awareness of a purple 3M product, and be counted as having identified 3M as a source of purple product." Reply Brief at 7. In effect, a telephone survey, to the extent that it was properly conducted, should not

40

minimize responses that would indicate trademark recognition.

> Q. In your opinion, is there any significance to the fact that purple includes a range of shades?
>
> A. Well, it means that because when people answer a question for purple, they can visualize a shade of purple that they're familiar with. It means that the results of the survey, if anything, overstate significance of any particular shade of purple.
>
> Because here it's for all shades of purple rather than a particular shade. Purple does not have significance. So any one shade of purple would have less than that.

Johnson dep. dated April 7, 2005 at 57-58.

Regarding the objection that a telephone survey should be virtually meaningless, we ultimately agree with opposer that, despite our initial misgivings, a telephone survey involving a color, at least under the facts of this case, is not inherently unreliable. To the extent that opposer's survey is subject to criticism, it could also be criticized as erring on the side of over-inclusion, because any customer who saw any shade of the color purple as indicating a single source for coated abrasives would have responded affirmatively.[11]

Regarding applicant's second objection that the survey questions screened for users rather than purchasers, again Mr. Johnson explained that "when you're dealing with

---

[11] There is no evidence to indicate that any non-de minimis number of participants, who were familiar with applicant's purple-coated abrasives' shade of purple, would actually verbalize 3M's color as another color, *e.g.*, blue, black, or red.

41

something like this, which is a product or service that is felt to have acquired distinctiveness through using it or seeing it, you need to ask people who use it or see it." Johnson dep. dated April 7, 2005 at 26. He further explained that inasmuch as these were "industrial interviews" and if you are a business user, "they are the people for whom the color of sandpaper should have distinctiveness." Johnson dep. dated April 7, 2005 at 27. These users included "people in manufacturing, woodworking, machine shops, car repair, metalworking, refinishing, cabinet-making, furniture-making, who are the SIC[12] codes identified by 3M in their interrogatories as the ones where purple is believed to have significance." Johnson dep. dated April 7, 2005 at 24. "Someone who buys it without seeing it would not know what color they're dealing with. So one would not feel it was appropriate to ask them about the color of these products." Johnson dep. dated April 7, 2005 at 27. To the extent that applicant does market a significant number of its products for commercial, as opposed to consumer use, the survey's screening question would limit the survey to those who had an opportunity to

---

[12] SIC – "Standard Industrial Classification: a system used by the federal government to classify business activities for analytical and reporting purposes." *The Random House Dictionary of the English Language (unabridged)* (2d ed. 1987). We take judicial notice of this definition. *University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co.,* 213 USPQ 594, 596 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

observe the color of the product as opposed to business buyers who may have little opportunity to see the actual color of the products they were buying based on other people's recommendations.

Overall, we find that the survey, despite some unusual features, is probative and we will accord it some weight on the question of acquired distinctiveness. Here, it provides some support for opposer's argument that applicant's mark has not acquired distinctiveness.

Another factor that weighs against applicant is the number of third-party users of purple-colored abrasives.

> In respect of registration, there must be a trademark, i.e., purchasers in the marketplace must be able to recognize that a term or device has or has acquired such distinctiveness that it may be relied on as indicating one source of quality control and thus one quality standard. When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances.

*Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 940-41 (Fed. Cir. 1984). *See also In re Boston Beer Co. L.P.*, 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999) ("The examples of use of the phrase by others in its descriptive form support the board's conclusion that the mark had not acquired distinctiveness").

> In this regard, we fully agree with opposer's contention that long and continuous use alone is insufficient to show secondary meaning where the use is not substantially exclusive.

43

*Flowers Industries Inc. v. Interstate Brands Corp.*, 5 USPQ2d 1580, 1588-89 (TTAB 1987).

In order to be relevant to the question of whether applicant's mark has acquired distinctiveness, the third-party uses do not have to be identical to applicant's mark. *Goodyear Tire and Rubber Co. v. Interco Tire Corp.*, 49 USPQ2d 1705, 1720 (TTAB 1998):

> Here, given the high degree of descriptiveness inherent in tire tread designs, together with the fact that many third parties have used designs similar to that of applicant -- including a significant number of substantially similar, but not identical, tire tread designs for mud and other all terrain tires, we are not convinced that the purchasing public has come to view applicant's three-stage lug configuration as a trademark for its tires.

There are several points that we need to address here. First, applicant seeks to distinguish some of the purple-coated abrasives sold by others by arguing that it "does not promote or sell its abrasive products in the beauty care marketplace." Brief at 10 n.6. *See also* Brief at 49 ("Because 3M does not market coated abrasives to the beauty industry, however, this argument [that the color purple is important in that industry] is irrelevant"). At the same time, applicant argues that it "now markets and sells 3M Purple paper-backed and cloth-backed coated abrasives to nearly every major industry in which abrasives are used." Brief at 27. In addition, despite its three motions to amend the description of the mark and identification of

44

goods in this case, it has not limited its "coated abrasives with either paper or cloth backing" to any particular industry. Therefore, applicant's identified goods must be presumed to include coated abrasives with either paper or cloth backing in the beauty care, dental, electronics, and other industries. As an analogy, a party seeking registration for its mark for "footwear" and alleging that it has acquired distinctiveness cannot dismiss evidence that others commonly use the same term to describe shoes by claiming that it is using the mark on sandals only. Applicant seeks registration of its mark for coated abrasives made of paper and cloth and it is not entitled to a registration for this mark unless the evidence shows that its mark has become distinctive for those goods. As a result, the uses by third parties of purple-colored paper and cloth abrasives in all fields is not only relevant, but it clearly supports the position that applicant's mark has not acquired distinctiveness.

Furthermore, we reject applicant's argument that coated abrasives that are not made of paper or cloth are irrelevant in determining whether applicant's mark has acquired distinctiveness. Use of the same or similar marks on related goods is relevant in determining whether applicant's mark has acquired distinctiveness. *Edward Weck Inc. v. IM Inc.*, 17 USPQ2d 1142, 1145 (TTAB 1990) (parenthetical

omitted) ("[O]ther factors also weigh in our conclusion that applicant has failed to establish acquired distinctiveness. First, opposer has demonstrated that others have used and are using the color green for related products. Applicant's use has therefore not been exclusive"). *See also Spraying Systems Co. v. Delavan Inc.*, 975 F.2d 387, 24 USPQ2d 1181, 1186 (7th Cir. 1992) ("[E]vidence of third-party use of the 'JET' formative casts further doubt on Spraying Systems' assertion of secondary meaning. While it is true that the probative value of this evidence is somewhat diminished by Spraying Systems' contrary evidence of lack of use and the only distant relatedness of several third-party products, there is enough relevant third-party use that the point retains its vitality").

The evidence shows that applicant sells film, paper and cloth coated abrasives. These coated abrasives are often marketed to the same customers in the same fields. These purchasers, who are familiar with the common use of colors (including purple) on film coated abrasives are much less likely to believe that, on paper and cloth coated abrasives, where colors are also used, that one color, purple, identifies the product of a specific company.

Applicant also argues that "SG cites its laundry list of so-called 'purple' products that allegedly negates any claim that 3M might have of exclusive use… But none of

these products are 3M Purple in color." Brief at 29.
However, the fact that other shades of purple are not the
same as applicant's shade does not mean that these products
are irrelevant. *Edward Weck Inc.*, 17 USPQ2d at 1145 ("Since
others have used this same color, albeit a different shade
of the color green, the relevant public is less likely to
view the color as an indicator of origin than as mere
ornamentation lacking in trademark function"). *See also*
*Brunswick I*, 28 USPQ2d at 1203 ("When the party which claims
that matter has become distinctive of its goods is faced
with use by others of the same or similar matter on the same
goods, that party has a difficult burden to meet").

Here, opposer has submitted evidence of the use of the
color purple or colors that are shades of purple for coated
abrasives. While it is unlikely that everyone would agree
that all of opposer's examples are necessarily purple, it is
clear that this is evidence that various shades of purple
are used on coated abrasives by others.

We note that where "the use of colors is common in a
field, an applicant has a difficult burden in demonstrating
distinctiveness of its claimed color." *In re Howard S.*
*Leight and Associates Inc.*, 39 USPQ2d 1058, 1060 (TTAB
1996). This is not a case such as *Owens-Corning* where color
is an unusual feature for paper and cloth abrasives.
Rather, it is a case where color is used by others in the

47

field for a variety of reasons.  Applicant, therefore, has a difficult burden in this case of establishing acquired distinctiveness.  When we consider all the evidence of record on the issue of acquired distinctiveness, applicant's evidence falls short of showing that its specific shade of purple has acquired distinctiveness.  We reach this conclusion after having considered applicant's evidence of acquired distinctiveness both individually and as a whole that may be greater than the sum of its individual parts.  Nonetheless, despite the volume of evidence, there is little direct evidence of customer recognition, and applicant's circumstantial evidence is simply not very persuasive.  We conclude that, ultimately, applicant has not sustained its burden of showing that its mark has acquired distinctiveness.  Therefore, the opposition is sustained for that reason.

### Functionality

While we have found that applicant's mark is not entitled to registration because it has not acquired distinctiveness, we proceed to the last issue, which is the question of whether applicant's mark is functional.  "Like any other mark, the use of color -- if functional -- cannot serve as a trademark."  *Brunswick II*, 32 USPQ2d at 1120.  Furthermore, "[f]unctionality having been established, whether [applicant's design] has acquired secondary meaning

need not be considered." *TrafFix Devices Inc. v. Marketing Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1007 (2001). *See also M-5 Steel Mfg. Inc. v. O'Hagin's Inc.*, 61 USPQ2d 1086, 1097 (TTAB 2001) (If "applicant's designs are functional, any evidence of distinctiveness is of no avail to applicant in support of registration").

On the subject of functionality, the Supreme Court has held:

> Discussing trademarks, we have said "'[i]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" [*Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165, 34 USPQ2d 1161 (1995)] (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850, n. 10 [214 USPQ 1] (1982)).

*TrafFix Devices*, 58 USPQ2d at 1006.

In addition, the Federal Circuit has discussed the effect of the amendment of the Lanham Act to expressly provide for the refusal of trademarks on the ground of functionality.

> Congress explicitly recognized the functionality doctrine in a 1998 amendment to the Lanham Act by making "functionality" a ground for ex parte rejection of a mark. 15 U.S.C. §1052(e)(5) (2000). Under this provision, a mark that comprises "any matter that, as a whole, is functional" is not entitled to trademark protection. *Id.* (emphasis added). Although the new statutory basis for refusal of registration does not apply in this case, we note that the 1998 amendment was intended to "make explicit some of the current practices of the Patent and Trademark Office with respect to the trademark protection of matter that is wholly functional," and referred to the amendment as a "mostly technical," "housekeeping" amendment.

49

*Valu Engineering Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1425 (Fed. Cir. 2002) (footnotes omitted). Because the application at issue here was filed on May 18, 1998, the statutory functionality section does not apply. *Valu Engineering*, 61 USPQ2d at 1425 n.3 ("The statute applies only to applications filed after October 30, 1998").

In this case, opposer seeks to show that the color purple is functional for coated abrasives because "purple is a by-product of the manufacturing process, and purple is used in color-coding." Brief at 38. Opposer argues that "the purple of SG's Premium Red products is based in part on the components and the purple color of SG's R228 family of products is the natural by-product of the manufacturing process, and appropriation of the purple color by 3M would disadvantage SG, requiring it to alter products it has sold for more than 30 years." *Id.* More specifically, opposer maintains that "[d]yeing coated abrasives a dark color has the functional use of concealing imperfections like cracking and streaking. Purple is a dark color. 3M's purple color, therefore, is functional when used on coated abrasives. It functions to conceal imperfections like cracking and streaking." Reply Brief at 15 (citation to record omitted).

Applicant, on the other hand, points out that "SG's abrasives are simply not purple." Brief at 37. Furthermore, "SG claims of *de jure* functionality also fail

50

because there are simply too many variables at play in the manufacturing process to support SG's argument. It is simply impossible to predict that this process would, with any regularity, produce a single color close to 3M Purple." Brief at 38. Applicant also points out that opposer's expert witness stated "that '[c]olor, per se, is not related to the performance of a coated abrasive….' SG Ex. 17 at 1, an obvious admission that color is not functional." Brief at 38 n. 23.

We start by noting that the color of an item can be a functional feature of the goods even if it does not make the product perform better. *See Brunswick II*, 32 USPQ2d at 1122-23:

> The color black, as the Board noted, does not make the engines function better as engines. The paint on the external surface of an engine does not affect its mechanical purpose. Rather, the color black exhibits both color compatibility with a wide variety of boat colors and ability to make objects appear smaller. With these advantages for potential customers, the Board found a competitive need for engine manufacturers to use black on outboard engines. Based on this competitive need, the Board determined that the color was de jure functional. This court discerns no error in the Board's legal reasoning and no clear error in its factual findings.

Therefore, the statement of opposer's expert was not an admission that applicant's mark was not functional.

Next, the witness explained the intricacies of the process of making coated abrasives. *See* Freese dep. dated March 31, 2005 at 23 – 24:[13]

Q. Do coated abrasive products come in different colors?

A. Yes.

Q. What colors of coated abrasive products have you seen over the years?

A. Almost white to black, and all colors in between.

Q. Do you have an understanding why coated abrasive products come in different colors?

A. Yes. It is usually based on what materials are used to produce the coated abrasives.

Q. Do people add dyes and other coloring agents to coated abrasive products?

A. Yes.

Q. In what circumstances are you familiar with companies adding dyes or coloring agents for coated abrasive products?

A. They will sometimes add color to the backing material so that when the coated abrasive is flexed, you don't see cracks. They will add color sometimes, or they will add some sort of pigments to try to get away from what looks like streaking. It is usually cosmetic, and they will add color to denote application if it is woodworking or whatever, you know.

Mr. Freese testified that several factors affect the color of an abrasive. One is the color of the backing material.

Either it is a white, or if it is treated with a phenolic, it is going to be red or real maroon.

---

[13] The Freese testimony is similar to the previously discussed evidence concerning the use of color in the abrasive industry.

Depends on the fillers and such. Then you have the resin itself, which is usually highly colored.

Q. But with a phenolic resin[14] such as Exhibit 70, is this generally a product which would be, what did you say, very deep red?

A. Yes. It can range anywheres from depending on the catalyst from an amber all the way up to a deep purple.

Q. And what would cause a phenolic resin such as Exhibit 70 to go from a deep red into a purple color?

A. Type of catalyst, and the concentration of the catalyst.

Q. What is the catalyst used for?

A. The catalyst is actually what drives the reaction to make the resin…

Q. And what kind of catalysts are used in making phenolic resins that are used for making coated abrasives?

A. Usually sodium hydroxide, sodium carbonate, barium hydroxide. And that's the main ones.

…

Q. What is that impact?

A. Usually makes them somewhat red in color depending on the concentration. The more catalyst, the deeper the red up to and including purple.

Freese dep. dated March 31, 2005 at 25, 27 – 28.

Another factor that can affect color is the filler that is used in the manufacturing process.

---

[14] "Phenolic resins continue to be the most important bonding systems and the development of today's high performance products would not have been possible without them… Because of their hardness, toughness, and heat resistance, phenolic resin adhesives are more durable than glue bonds. Fillers added to the formulation further increase bond strength and aid in dissipating heat." *Coated Abrasives* at 14, R. Herron Ex. 1.

A. Yes, graphite is used as a filler.

Q. Does graphite have any other function when it is used in connection with coated abrasive products?

A. Yes.  It reduces static.  And it also makes the coated abrasive somewhat dark in color.  Almost toward a black…  It could go from a gray to almost a black depending on how much you put in.

Freese dep. dated March 31, 2005 at 35.

The substrate (backing) can also effect the color.

Q. And I believe you testified that the substrate and the binder color may interact; is that true?

A. Yes.  That's the – it has to or they would just fall off…

Q.  And are there occasions when an interaction may product a deep red or a purple color?

A. Yes.  If you have a red resin, you have blue backing, you are going to get a purple color showing through.

Freese dep. dated March 31, 2005 at 35-36.

In response to this testimony, applicant argues that opposer's argument of functionality "fails because there are simply too many variables at play in the manufacturing process to support SG's argument…  Mr. Freese and SG engage in a technical exercise in 'what if.'  Both emphasize the countless different variables that can impact the resultant color of a coated abrasive."  Brief at 38.

This case is different from most color functionality cases.  In the typical color case, the final color of the product is normally dictated by aesthetic considerations. In *Owens-Corning*, the Court found that a "pink color mark

registered for fibrous glass insulation does not confer a 'monopoly' or act as a barrier to entry in the market. It has no relationship to production of fibrous glass insulation. It serves the classical trademark function of indicating the origin of the goods." 227 USPQ at 421. Furthermore, the record revealed that *Owens-Corning* was the only manufacturer to color insulation, which was ordinarily a light yellow-white coloring. 227 USPQ at 420. Similarly, in *Brunswick II*, the basic color of the engines after the manufacturing process was not an issue.

In these Federal Circuit cases, the product was not alleged to come in a variety of colors as a result of the manufacturing process. The products all seemed to come in a basic color that was then dyed or painted the desired color. *See also In re Ferris Corp.*, 59 USPQ2d 1587 (TTAB 2000) (Pink for bandages); *In re Orange Communications Inc.*, 41 USPQ2d 1036 (TTAB 1996) (Orange and yellow pay telephones); *Edward Weck Inc.*, 17 USPQ2d 1142 (Green for surgical instruments).

What is unusual about this case is that the manufacturing process of coated abrasives, unlike insulation, results in products with numerous colors. Indeed, even a quick glance at many company catalogs of record such as opposer's, applicant's, and third parties' featuring coated abrasives demonstrates that the world of

coated abrasives is not a monochromatic or black and white world.  Instead, it is one in which color is diverse and common.

As discussed previously, coated abrasives consist of a backing, abrasive particles, and an adhesive/bonding agent.

> There are approximately 750 different types of raw materials used in the manufacture of coated abrasive products.  The variable combinations of these component parts are *almost limitless*.  Backings might be film, paper, cloth, fiber, or a combination of these materials.  The bonding agents or adhesives can be any number of different glues and resins.  And the abrasive grains in general use today range from natural and synthetic minerals such as emery, garnet and crocus, through aluminum oxide, silicon carbide and the new zirconia alumina and ceramic alumina abrasive combinations.

CAMI's "Coated Abrasives" brochure at 2, R. Herron dep. Ex. 1 (emphasis added).

These many different combinations of materials can result in coated abrasives of many colors.  Freese dep. dated March 31, 2005 at 23-24 ("Almost white to black, and all colors in between").

Further complicating the picture is the fact that manufacturers of coated abrasives tend to dye their products for a variety of reasons, including to maintain a uniform appearance.

> Q. Do people add dyes and other coloring agents to coated abrasive products?
>
> A. Yes.

Q. In what circumstances are you familiar with
companies adding dyes or coloring agents to coated
abrasive products?

A. They will sometimes add color to the backing
material so that when the coated abrasive is flexed,
you don't see cracks.  They will add color sometimes,
or they will add some sort of pigments to try to get
away from what looks like streaking.

Freese dep. dated March 31, 2005 at 24.

The dyes tend to be darker in tone to mask streaking in

the products.  Freese dep. dated March 31, 2005 at 42.

Occasionally, color is added to accommodate customers'

requests.

Q. You mentioned the automotive industry you testified
about currently [a major corporation] has requested a
purple color product.  Can you tell me what kind of
product that is?

A. It is a film product.  They are asking specifically
for a purple product.  They had to approve the color
and they insisted that it be purple.  And frankly the
root of that request came from the technology center
and I think was driven more by one particular
individual than anyone else.  But he made it abundantly
clear that if the product that he offered was not
purple we would not be able to sell them.

R. Herrin dep. dated March 29, 2005 at 180.

In addition, "sometimes the color is determined by the

grit used."  Freese dep. dated March 31, 2005 at 23.

Similarly, the filler can effect color.  Freese dep. dated

March 31, 2005 at 35 (Graphite, which is used as a filler,

"makes the coated abrasive somewhat dark in color").

Finally, another factor we must consider is that the

field of coated abrasives is not a static field.  New

57

abrasives, backing, and bonding materials are being developed, and each of these materials may result in a change in color. *See Coated Abrasives History*, "Coated Abrasives" brochure, Herron dep. Ex. 1 at 3-4. *See also Id.* at 5 ("The continuing evolution of manufacturing methods and equipment has seen similar developments within the coated abrasives industry. Stronger backings, tougher minerals, improved adhesive systems and better splices are results of an ongoing technological effort to meet the increasingly critical demands of the marketplace").

Therefore, we consider the fact that the field in which the parties compete is a dynamic field in which innovation is constantly occurring. Also, as discussed earlier, color is common. Furthermore, there are hundreds of combinations of abrasives, backing, and adhesives that result in numerous natural colors of the adhesives. In the field, there are also reasons for manufacturers to add dyes to darken the coated abrasives. Indeed, several shades of the color purple appear on various coated adhesive products. Therefore, with respect to competitive need, we find that opposer has set out a prima facie case that coated abrasive manufacturers have to be able to use various shades of purple, including applicant's.

Another argument that opposer makes is that "[c]oated abrasives are color coded to denote application and grit or

coarseness." Brief at 39. *See Kasco Corp. v. Southern Saw Service Inc.*, 27 USPQ2d 1501 (TTAB 1993) ("[T]he foregoing clearly establishes that Southern Saw's various 'color-keyed' or 'color-coded' wrappers -- including its green wrapper -- serve to enable purchasers and users of the blades to quickly identify and distinguish one blade type from another. Thus, the various colored wrappers have a functional or utilitarian purpose"). Opposer points to the fact that color coding nonwoven, film and other coated abrasives is common and that color is often used to designate grit size. *See* Sternberg dep. dated April 7, 2005 at 12 ("I know a lot of industries that use it [color-coding]. The, the [sic] hobby industry uses it, the electronics industry. There's even a fellow who polishes and refinishes pool sticks. He uses his so that if he, if it has a nick in it he refurbishes it that way"); *Id.* at 96 ("Q. Do a lot of companies use color coding systems other than yourself, do others use color coding systems? A. Yes"); J. Herrin dep. dated March 30, 2005 at 23 ("We have a clear color coding scheme for our film products that identifies the grit size of the abrasive by the color of back print… I know the other competitors, at least Moyco uses the color coding system for their grit sizes"). *See also* Kodaka dep. dated April 20, 2005 at 19-20:

> Q. Mr. Kodaka, do you know of or are you familiar with any sort of color coating [sic coding?] system?

A. Yes.

Q. I'm sorry with coated abrasives?

A. Yes. It's general knowledge that some end users, customers, would like to see the abrasive films, in different color coating so that their operators would not make a mistake in applying the wrong abrasive film for their specific application…

For instance, the largest application would be the fiberoptic application for MIPOX, and usually they would use maybe two or three different abrasives going from course [sic coarse?] to fine, and they would like to see the two or three different abrasive films in different colors so that they would not use the wrong abrasive in the wrong order.

Indeed, applicant itself uses color coding for its abrasive products.[15]

Q. The product is described as maroon, slash, purple. Do you see that, sir?

A. Yes.
***

Is that an instance of 3M using purple to indicate applications?

A. For nonwovens, yes, and not for coated. That's when – when I answered the question before, I was referring to coated abrasives. The nonwovens do have color that indicates application and how coarse the – how coarse the nonwoven is.

Q. And the nonwovens are sold by the same distributors as sell the coated abrasives; is that correct?

A. Yes.

---

[15] As mentioned earlier, there is some disagreement about whether nonwoven abrasives are coated abrasives. The CAMI brochure that was produced in cooperation with applicant clearly identifies nonwoven abrasives as coated abrasives. Even if they are not, as the evidence indicates, they are related to coated abrasives.

And the nonwovens are sold for use in the automotive aftermarket, just as are the coated abrasives; is that correct?

A. Yes.

DeNuccio dep. at 62 and 64. *See also* Wimer Ex. 14 p.12 ("Scotch-Brite pads [non-woven synthetic construction floor pads] are color-coded to easily indicate the aggressiveness of the cut. The lighter the pad color, the less aggressive the cut; the darker the color, the more aggressive the cut"); Zelgart dep. Ex. 22 ("General Purpose Grade Maroon/Purple Abrasives" and "Ultra Fine Grade Gray Abrasives"); Kelly dep. Ex. 13 at 9 (emphasis added):

> *3M Industrial Products for Metalworking*
> Prices effective as of March 6, 2005
> 3M™ Roloc™ Discs
> Proved a fast, efficient method of grinding, blending, leveling and finishing on all types of metal. They lock securely in place with just a half twist…another half twist and they're off. *Each disc is color coded by grad*e.

At one point, applicant even introduced a paper-coated abrasive product that was color coded with purple as one of the colors used to code the product.

> Q. Now, sir, did the SandBlaster test line, SandBlaster hand-sanding test line we've been talking about, did the products come in three different colors?
>
> A. Yes, it did – yes, they did.
>
> Q. And which colors were selected to become a part of this new line?
>
> A. Green purple and gold…
>
> Q. And how did you come up with the green color?

A. The green was a product that had been in the company for – since, really, 1998. It was designed for sanding, stripping later paint, so it was a really good fit; and we'd been selling the gold product for a number of years as well, and both of those being premium products, and it excelled in its between coat, finer grades…

Q. And why did you choose purple at the time?

A. Well, we assessed our – our timeline as to the test, and we also – our technical capabilities. You know the green was in the company, and the gold was in the company as products as purple – as was purple. So all of the raw materials, the resins, the pigment that goes into making purple was in the company, and it was an easy – it was an easy choice given our tight timeline to get launch – test – you know, get into that test base.

Zelgart dep. dated June 17, 2005 at 63-64.

Applicant points out that someone "erroneously chose 3M Purple as the color used to designate the bare surfaces product in the test market. As soon as the error was discovered – just after the limited test market run[16] – 3M immediately removed 3M Purple from the SandBlaster™ hand sanding line."[17] Brief at 42. The SandBlaster "launched nationally in early 2001 with a green, maroon and gold offering." Brief at 43; Zelgart dep. dated June 17, 2005 at 69.

While we are not convinced that third parties would necessarily have to use applicant's shade of purple to color

---

[16] The test market consisted of "a couple of hundred stores to Wal-Mart." Zelgart dep. dated June 17, 2005 at 62.

code their coated abrasives, we nonetheless see the evidence of color coding as support for the general proposition that there is a competitive need for color, including the color purple, to be available for others to use in the coated abrasive industry.[18]  In the field of coated abrasives, color serves a myriad of functions, including color coding, and the need to color code lends support for the basic finding that color, including purple, is functional in the field of coated abrasives having paper or cloth backing.

When we consider this evidence, we find that applicant has not rebutted opposer's prima facie case that there is a competitive need for others in the industry to use the color purple.  Significantly, unlike other cases, there is a competitive need for others to produce coated abrasives using a variety of materials.  These materials result in coated abrasives that are a variety of colors.  The colors that may result include shades of purple.  While applicant is claiming a distinct shade of deep purple, it admits that it sells products that are in different shades of purple, including those that bear a legend claiming that the purple color is a trademark of applicant's.  Indeed, because of the vagaries of color with coated abrasives, applicant actually

---

[17] Apparently references remained on applicant's website until 2005.  Zelgart dep. dated June 17, 2005 at 178.  Applicant's Brief at 42 n. 27.

sells a coated abrasive that is lighter in color than its claimed shade, because when the abrasive is actually used, it will appear as the deep shade of purple. Applicant's Brief at 45 ("[T]o prevent loading on fine grit sandpaper, 3M uses a white stearate, or lubricant, on top of the deep purple color. This results in a product that appears lighter in color. In fact, however, as the stearate is worn off during the sanding process, the original deep purple color shows through") (citation to record omitted).

When color is so subject to variables that applicant itself needs to sell its own "distinct" shade of purple in a different shade of purple, it would place competitors at a disadvantage if they were forced to vary their production techniques and research to avoid subjecting themselves to claims of infringement by a company that cannot consistently market its own product with the same distinctive shade of purple.[19] In this varied and innovative field, applicant

---

[18] Of course, this evidence provides additional support for our earlier finding that applicant has not demonstrated that its mark has acquired distinctiveness.

[19] We add that in industries such as the coated abrasive industry where color is common, the ability to distinguish even "distinctive" shades of color becomes more difficult because of the inherent variability of consistently reproducing color. Opposer's color expert testified as follow:

    Q. Correct. But if you have a – if you did receive a
    cutout of the actual piece of sandpaper that was submitted
    by 3M, then all ambiguity would be removed as to what the
    color was that was covered by the application?
    A. Well, that's an interesting question. There still
    would be ambiguity because of a number of things. Even
    within a particular sample you can have variations across
    the sample.

simply cannot foreclose others from using a deep color purple that may result from either the manufacturing or dyeing process.

We also note that producers of coated abrasives also frequently dye their coated abrasives. Normally, the dye is a dark color to help mask streaking and other problems. Applicant's deep purple shade would fall within the category of results that could occur when competitors attempt to dye their products. We find the rationale below to be relevant to the facts of this case.

> In contrast to the many shades of color available for fiberglass insulation, the evidence shows that the color palette available for the manufacture of fly rods is extremely limited. One limiting factor is the method by which the color is applied to the rod. The rod is made in part of graphite, which is a carbon and so is naturally black, and the color is applied as a dye, not a paint. Only a few dark shades successfully mask the black base and colors applied to it darken deeply. Under these circumstances, granting exclusive use of a color to one manufacturer would severely restrict competition; there would be little left for the rest of the world.

*R.L. Winston Rod Co. v. Sage Manufacturing Co.*, 838 F. Supp. 1396, 29 USPQ2d 1779, 1781 (D. Mont. 1993). *See also Qualitex*, 34 USPQ2d at 1165 ("[If] a 'color depletion' or

---

I was making reference to the point that from output to output to output to output there's variations over time, both even within a single run and then from run to run. But -- and then there is degradation over time… We can show up in Washington and say, "Can we see that sample again," and it would have undergone some degradation, and we don't know if it was the same color as it was the day we attached it. Rosen dep. at 57-58.

"color scarcity' problem does arise -- the trademark doctrine of 'functionality' normally would seem available to prevent the anticompetitive consequences").

Further, applicant argues that "3M Purple is not the only shade available" citing *Brunswick II* (Brief at 48). First, *Brunswick II* did not set out a rule that a color is functional if it is the only shade available. Second, *Brunswick II* is distinguishable because there was no indication that outboard engines came in a variety of colors as a result of the materials used in the manufacturing process. In contrast, here the record establishes that coated abrasives come in a variety of natural colors and these products are often then dyed for a variety of reasons. Therefore, the situation in *R.L. Winston* is analogous, because naturally dark-colored abrasives would then need to be dyed often with a dark color. As *R.L. Winston* held: "It is not so important to categorize the function of the color, however, as it is to determine whether manufacturers have a competitive need for using a limited number of colors. If competitive factors restrict the availability of color, then color may be functional." 29 USPQ2d at 1781. A deep purple color would be one of a small number of dark colors that would help manufacturers dye their products to avoid streaking or other imperfections.

We add that the color purple in various shades for coated abrasives including some that are remarkably close to applicant's have already been used by others. Colors of all types are widely used in the coated abrasive industry including coated abrasives that have paper or cloth backings. Color variety is a naturally occurring result of the manufacturing process and in light of the continuous changes in the industry, the need for color is likely to expand. Furthermore, the dying process for coated abrasives is another variable that affects the color of coated abrasives. All these factors argue for a competitive need for the deep shades of purple to remain available for others in the coated abrasive industry.

Once the opposer in a trademark opposition has made a prima facie showing of functionality, the burden shifts to the applicant to prove nonfunctionality.

> Where, as here, the opposer in a trademark opposition has made a prima facie showing of functionality, the burden shifts to the applicant to show nonfunctionality… The appropriateness of shifting the burden in a trademark opposition proceeding is supported by the recent amendment to Section 43(a) of the Lanham Act, which shifts the burden of proving nonfunctionality of unregistered trade dress to applicant-plaintiff in civil actions for trade dress infringement, even without a prima facie showing by the alleged infringer. 15 U.S.C. § 1125(a)(3)(2000).

*Valu Engineering*, 61 USPQ2d at 1429 (citations and footnote omitted). *See also Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1029, 224 USPQ 625, 629 (Fed. Cir. 1985)

("[A]n applicant for trademark protection has the burden to prove that the design is nonfunctional, once a prima facie case of functionality is made by the opponent").

However, as discussed above, we find that applicant has not sustained this burden of showing that there is no competitive need for others to use the color purple and that its deep purple color is not functional. "[I]f the use of color on the applicant's goods serves a non-trademark purpose that hinders competition, the de jure functionality doctrine precludes trademark protection." *Brunswick II*, 32 USPQ2d at 1123. In view of the fact that color, especially color that is dark in nature, both natural and dyed, is a common and useful feature in the field of coated abrasives, applicant's color purple is functional because "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 34 USPQ2d at 1164.

Decision:  The opposition is sustained.